1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                             CENTRAL DISTRICT OF CALIFORNIA

10   LAM DAT QUAN,                              Case No. 5:25-cv-02546-HDV-PVC

11
                                                **ORDER GRANTING PRELIMINARY**
12                 Petitioner,                  **INJUNCTION [9]**

13

14            v.

15

16   MARK BOWEN, Warden,

17

18                 Respondent.

19

20

21

22

23

24

25

26

27

28

1    **I.    INTRODUCTION**

2         Petitioner Lam Dat Quan entered the United States in 1987, at eleven years old.  On July 25,

3    2001, after serving a criminal sentence for a crime committed at age seventeen, he was ordered

4    removed to Vietnam.  Because he was not immediately removable, he was released on an order of

5    supervision several months later.  In the over two decades since, he has regularly checked in with

6    ICE, complied with his conditions of release, and committed no crimes.

7         When he appeared for a regularly scheduled ICE check-in in August 2025, Petitioner was

8    detained.  He has been in custody at the Adelanto Detention Facility ever since.  This habeas petition

9    followed.

10         Before the Court is Petitioner's request for a temporary restraining order ("Motion").

11   [Dkt. 9].  Given that the merits of the request for release have been fully briefed and heard, and

12   because the legal standard is the same, the Court converts the Motion to a request for a preliminary

13   injunction.  *See* Opposition [Dkt. 11]; Reply [Dkt. 12]; Hearing [Dkt. 13].

14         For the reasons discussed below, the Motion is granted.  Respondent is ordered to release

15   Petitioner from custody forthwith.

16   **II.    BACKGROUND**

17       **A.    Factual Background**

18         Petitioner Lam Dat Quan is a native and citizen of Vietnam.  Motion at 1; Opposition at 2;

19   Declaration of Enrique Chavez ("Chavez Decl.") ¶ 5.  He entered the United States via the Orderly

20   Departure Program in 1987, around the age of eleven, and obtained his legal permanent resident

21   status that same year.  Motion at 1; Declaration of Lam Dat Quan ("Quan Decl.") ¶ 2.

22         In October 1993, at the age of seventeen, Petitioner was convicted of second-degree murder.

23   Motion at 1; Opposition at 2; Chavez Decl. ¶ 6.  After serving his sentence, he was transferred to

24   immigration custody and placed into removal proceedings.  Motion at 1; Opposition at 2; Quan Decl.

25   ¶ 3; Chavez Decl. ¶ 7.  He was ordered removed to Vietnam on July 25, 2001.  Motion at 1;

26   Opposition at 2; Quan Decl. ¶ 4; Chavez Decl. ¶ 8.  He was released on an Order of Supervision on

27   November 13, 2001.  Motion at 2; Opposition at 2; Quan Decl. ¶ 6; First Amended Petition, Ex. F at

28   72 (2001 Order of Supervision), Exs. B & C at 38–44 (2022 Order of Supervision).

In the past two-and-a-half decades, Petitioner has built a life in the United States.  He is an "architect engineer and general contractor."  Quan Decl. ¶ 13.  He is described as a "loving and dependable father" to his teenage son, Declaration of Trang Nguyen ("Nguyen Decl.") ¶¶ 1–2; Quan Decl. ¶ 14, and provides significant emotional, physical, and practical support to his other family, including his mother and younger siblings, Declaration of Victor Quan ("Victor Decl.") ¶¶ 1–4; Declaration of Teresa Phuong Vu ("Vu Decl.") ¶¶ 1–5; Declaration of Nina Quan Wilkerson ("Wilkerson Decl.") ¶ 4; Quan Decl. ¶ 15.  He has not been to Vietnam since 1987 and has no relatives there.  Motion at 4; Quan Decl. ¶¶ 19–20.  He has regularly checked in with ICE and has not committed any crimes or violations of his conditions of release.  Quan Decl. ¶¶ 7, 10.

On August 29, 2025, when Petitioner went to a regularly scheduled ICE check-in, his release was revoked and he was detained.  Motion at 2; Opposition at 2–3.  The parties dispute exactly how this happened.  Quan asserts that he was given no prior notice of his detention, no notice or evidence that he violated any conditions of his supervision, no informal or formal interview, no opportunity to respond to any allegations, no reasons for the revocation of his release, no revocation custody review, and no officer determination if his re-detention was appropriate or necessary.  Motion at 2, 4; Quan Decl. ¶¶ 8, 10–12.  The government contends:

> Following a case review, interview of [Petitioner], and custody re-determination, [Petitioner] was personally served with a Notice of Revocation of Release.  In addition, [Petitioner] was served with a form I-205 Warrant of removal and form I-294 Warning to Alien ordered removed.  [Petitioner] was advised of his right to speak to a consular officer from Vietnam, which he declined.  [Petitioner] also claimed no fear of returning to Vietnam.

Chavez Decl. ¶ 9.

Petitioner is currently detained at Adelanto Detention Center.  Motion at 2; Chavez Decl. ¶ 10; First Amended Petition, Ex. F at 69.

**B.    Procedural Background**

On September 25, 2025, Quan filed a Petition for Writ of Habeas Corpus ("Petition"). [Dkt. 1].  Following a Court order, Quan filed a First Amended Petition for Writ of Habeas Corpus

1    naming the correct Respondent on October 14. *See* Order Dismissing Petition With Leave to Amend

2    [Dkt. 4]; ("First Amended Petition") [Dkt. 5].[1]

3        On October 29, Petitioner filed the present Motion for a temporary restraining order. Finding

4    that the Motion raised substantial questions on the merits, the Court immediately enjoined

5    Respondent from deporting Petitioner to a third country pending its resolution, and ordered an

6    expedited Opposition and Reply. [Dkt. 10]. The Court heard oral argument and took the Motion

7    under submission on November 12. [Dkt. 13].

8   **III.    LEGAL STANDARD**

9        The standard for issuing a temporary restraining order is the same as that for issuing a

10   preliminary injunction. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7

11   (9th Cir. 2001); *see also Lockheed Missile & Space Co. v. Hughes Aircraft Co.*, 887 F. Supp. 1320,

12   1323 (N.D. Cal. 1995). To prevail on such a motion, the movant must establish that (1) he is likely

13   to succeed on the merits, (2) he is likely to suffer irreparable harm absent the temporary restraining

14   order, (3) the balance of equities tips in his favor, and (4) a temporary restraining order is in the

15   public interest. *Winter v. Nat. Ress. Def. Council, Inc*., 555 U.S. 7, 20 (2008); *Meinecke v. City of*

16   *Seattle*, 99 F.4th 514, 521 (9th Cir. 2024). Where the non-movant is a government entity, "the third

17   and fourth factors . . . merge." *Fellowship of Christian Athletes v. S.J. Unified Sch. Dist. Bd. of*

18   *Educ.*, 82 F.4th 664, 695 (9th Cir. 2023) (en banc). In the Ninth Circuit, the *Winter* factors may be

19   evaluated on a sliding scale such that "a stronger showing of one element may offset a weaker

20   showing of another." *Id*. at 684 (citation omitted). "When the balance of equities 'tips sharply in the

21   plaintiff's favor,' the plaintiff must raise only 'serious questions' on the merits—a lesser showing

22   than likelihood of success." *Id*. (citation omitted).

23

24     ————————————————

25   [1] Through his First Amended Petition, Quan alleges that his detention violates substantive due process (because the government has no valid interest in detaining him and because the conditions of

26   confinement constitute punishment) and constitutional, statutory, and regulatory procedural protections (because the procedural steps required for revocation were not followed). First Amended

27   Petition at 24–28. Quan also argues that the threat of his removal to a third-country also violates the Immigration and Nationality Act and its implementing regulations, the Administrative Procedure

28   Act, and the Fifth and Eighth Amendments to the Constitution. *Id.* at 25–26, 28–30.

1    **IV.    DISCUSSION**

2        **A.    Likelihood of Success**

3        Detention, release, and removal of individuals ordered removed is governed by 8 U.S.C.

4    § 1231(a). *Johnson v. Arteaga-Martinez*, 596 U.S. 573, 578 (2022). A noncitizen shall be removed

5    within 90 days of the removal order, subject to a potential 90-day extension. 8 U.S.C. § 1231(a)(1).

6    However, once that period passes, and the noncitizen is not removed, they "shall be subject to

7    supervision under regulations prescribed by the Attorney General." *Id*. § 1231(a)(3). The noncitizen

8    may be detained beyond the removal period under certain conditions, but "if released, shall be

9    subject to the terms of supervision in paragraph (3)." *Id*. § 1231(a)(6).

10        Sections 241.4 and 241.13 of Title 8 of the Code of Federal Regulations govern the release of

11    noncitizens pursuant to 8 U.S.C. § 1231(a). Section 241.4, titled "Continued detention of

12    inadmissible, criminal, and other aliens beyond the removal period," sets "out procedures DHS must

13    follow to impose continued detention." *Johnson v. Guzman Chavez*, 594 U.S. 523, 529 (2021).

14    Section 241.13, titled "Determination of whether there is a significant likelihood of removing a

15    detained alien in the reasonably foreseeable future," implements the Supreme Court's decision in

16    *Zadvydas v. Davis*, 533 U.S. 678 (2001). *See Guzman Chavez*, 594 U.S. at 529. In *Zadvydas*, the

17    Supreme Court held that a noncitizen may be detained only for a period "reasonably necessary" to

18    bring about their removal from the United States—presumptively six months. 533 U.S. at 689, 701.

19    After that point, if the noncitizen "provides good reason to believe that there is no significant

20    likelihood of removal in the reasonably foreseeable future," the government must either rebut that

21    showing or release them. *Id.* at 701.

22        Both sections also contain provisions governing the *revocation* of release. *See* 8 C.F.R.

23    §§ 241.4(l), 241.13(i). Under section 241.4(l), release may be revoked when a noncitizen violates

24    the conditions of their release or "in the exercise of discretion when, in the opinion of the revoking

25    official":

26        (i) The purposes of release have been served;
        (ii) The [noncitizen] violates any condition of release;
27        (iii) It is appropriate to enforce a removal order or to commence removal proceedings against
        a[ noncitizen]; or
28

(iv) The conduct of the [noncitizen], or any other circumstance, indicates that release would no longer be appropriate.

8 C.F.R. § 241.4(l)(1), (2).  Under section 241.13(i), release may be revoked if a noncitizen violates the conditions of their release or "if, on account of changed circumstances, the [government] determines that there is a significant likelihood that the [noncitizen] may be removed in the reasonably foreseeable future."  8 C.F.R. § 241.13(i)(1), (2).

Both sections establish certain required process for the revocation of release.  Upon revocation of release, the noncitizen (1) "will be notified of the reasons for revocation of his or her release" and (2) will be given "an initial informal interview promptly after his or her return to [] custody to afford the [noncitizen] an opportunity to respond to the reasons for revocation stated in the notification."  8 C.F.R. §§ 241.4(l)(1), 241.13(i)(3).  If the noncitizen continues to be detained after the informal interview, they shall be scheduled for the "normal review process," which begins with notification of a records review and scheduling of an interview, "which will ordinarily be expected to occur within approximately three months after release is revoked."  8 C.F.R. §§ 241.4(l)(3); 241.13(i)(2) ("[I]f the [noncitizen] is not released from custody following the informal interview . . . the provisions of § 241.4 shall govern the alien's continued detention pending removal.").  "In simpler terms, in order to revoke release, the government must notify the noncitizen of the ***reason*** for the revocation and give them both an ***informal and formal interview***."  *Delkash v. Noem*, No. 5:25-cv-01675-HDV-AGR, 2025 WL 2683988, at *4 (C.D. Cal. Aug. 28, 2025).

The parties dispute whether section 241.4 or 241.13 applies here.  *See* Motion at 12–13, 15–16 (discussing and applying § 241.13); Opposition at 7–8 (discussing broad discretion to revoke release under § 241.4); Reply at 2, 4–6 (arguing that § 241.13, not § 241.4 applies).  Section 241.4 is the broader provision, and it governs the detention of noncitizens under a final order of removal unless the government has made the specific determination that there is no significant likelihood of removal in the reasonably foreseeable future, in which case section 241.13 governs.  8 C.F.R. § 241.13(b)(1) ("Relationship to § 241.4").  The record is pretty thin as to why—and so under which section—Petitioner was first released on supervision after his order of removal in 2001.

Quan's initial order of supervision from November 2001 says that it is "[b]ecause the Service

has not effected your deportation or removal during the period prescribed by law."  First Amended

Petition, Ex. F at 72.  And, at that time, Vietnam was refusing to repatriate any Vietnamese

immigrant ordered removed from the United States.  *Trinh v. Homan*, 466 F. Supp. 3d 1077, 1083

(C.D. Cal. 2020).  It thus seems likely—which, at this preliminary stage, is sufficient—that

Petitioner was released because the government determined that there was no significant likelihood

that he would be removed in the reasonably foreseeable future; section 241.13 therefore governs his

release and its revocation.

Under that section, release can be revoked if a noncitizen violates the conditions or "if, on

account of changed circumstances, the [government] determines that there is a significant likelihood

that the [noncitizen] may be removed in the reasonably foreseeable future."  8 C.F.R. § 241.13(i)(1),

(2).  Here, there is no allegation that Quan violated any of his conditions of release.  *See* Motion at 4;

Quan Decl. ¶ 10; Reply at 5; *see generally* Opposition; Chavez Decl.  And Petitioner is likely to

succeed on his claim that the government cannot demonstrate that, "on account of changed

circumstances," there is now a "significant likelihood" that he will be removed to Vietnam "in the

reasonably foreseeable future."  *See* Motion at 11–17.

Petitioner argues that his removal to Vietnam is not reasonably foreseeable because, as a pre-

1995 immigrant, it is unlikely that Vietnam will issue travel documents for him.  *Id.* at 14–15.

Petitioner proffers an expert declaration explaining "Vietnamese refugee history in the United

States" and "Vietnam and United States relations regarding deportation to Vietnam, Vietnamese

with removal orders and obtaining travel documents."  Expert Declaration of Dr. Thao Ha ("Ha

Decl.") ¶ 3.[2]  Dr. Ha explains the significance of 1995 as the date when United States/Vietnam

diplomatic relations were normalized.  *Id.* ¶¶ 5, 7, 9–10.  Under the most recent diplomatic

agreement between the United States and Vietnam—a November 2020 Memorandum of

---

[2] Dr. Ha holds a doctorate in and is a professor of sociology, and his research focuses on
immigration and Vietnamese Americans.  Ha Decl. ¶¶ 1-2; First Amended Petition, Ex. G at 82–84
(Ha CV).  The Court finds Dr. Ha to be a qualified, credible, and persuasive expert witness, and
considers his testimony herein.

1    Understanding—Vietnam "began to process repatriation in some cases of pre-1995 refugees" and is

2    "in principle [] accept[ing] pre-1995 arrivals." *Id.* ¶¶ 10, 16–17; *see also* Motion, Ex. F at 55–60

3    ("2020 MOU"). But, he continues, obtaining a travel document requires a Vietnamese birth

4    certificate, a completed passport application and biography form, and two passport photos, which

5    immigrants who arrived in the United States often have difficulty acquiring because of war

6    displacement or linguistic barriers. Ha Decl. ¶¶ 12, 14. He avers that the process can take upwards

7    of 3–6 months. *Id.* ¶¶ 13–14. He also describes how the process is even more difficult, uncertain,

8    and protracted for individuals in immigration custody. *Id.* ¶ 15. Finally, Dr. Ha points to reports

9    produced in connection with the *Trinh* litigation between December 2021 and September 2023,

10    which show that 26 pre-1995 Vietnamese nationals with final orders of removal were detained for

11    prolonged periods—between 47 and 529 days, with an average of 160.5—while awaiting travel

12    documents. *Id.* ¶¶ 17–18; *see also* First Amended Petition, Ex. I at 97–103 (*Trinh* reports).

13        As to facts specific to Quan, he notes that the government was unsuccessful in removing him

14    in 2001. Motion at 14–15. He also notes that the government only requested his travel documents

15    after detaining him, and that the request has been pending for over a month and a half with no sign

16    of progress or even of an acknowledgement. *See* Reply at 12; Chavez Decl. ¶¶ 11, 13 (requested

17    September 23, 2025; pending as of October 22, 2025); *see also* 2020 MOU § 8(3), (4) (explaining

18    that Vietnam intends to issue travel documents for eligible individuals or notify DHS that individuals

19    are not eligible within "thirty (30) calendar days from the receiving date of a request").

20        The government's only evidence and argument as to the likelihood of Petitioner's reasonably

21    foreseeable removal is that it requested his travel documents, Chavez Decl. ¶ 11; that Vietnam now

22    considers requests from pre-1995 immigrants on a case-by-case basis and issues travel documents

23    for such immigrants in a "non-negligible portion of cases," *Trinh*, 466 F. Supp. 3d at 1090, "when

24    ICE has made such requests," Chavez Decl. ¶ 12; that ICE "has recently been able to timely obtain

25    travel documents and effectuate removals to Vietnam," *id.*; and that one Vietnamese citizen has

26    recently been efficiently and timely removed, *Huynh v. Semaia*, No. 2:24-cv-10901-MRA-DFM (C.

27    D. Cal.). Opposition at 5–6. But the government provides no specific statistics regarding how often

28    it is requesting—and how often it is receiving—travel documents from Vietnam in recent days for

1   noncitizens who, like Petitioner, arrived in the United States before 1995. *See generally* Opposition;

2   Chavez Decl.  Indeed, at oral argument, counsel for the government admitted that "we just don't

3   know one way or another at this point" whether Petitioner is likely to be removed in the reasonably

4   foreseeable future.

5          This is plainly insufficient to rebut Petitioner's showing that it is unlikely he will be removed

6   in the reasonably foreseeable future.  Other courts have found that the 2020 MOU—which gives

7   Vietnam total discretion whether to accept particular non-citizens—is not by itself sufficient to show

8   a changed circumstance or a significant likelihood of removal.  *See Hoac v. Becerra*, No. 2:25-CV-

9   01740-DC-JDP, 2025 WL 1993771, at *4 (E.D. Cal. July 16, 2025); *Nguyen v. Hyde*, 788 F. Supp.

10  3d 144, 151 (D. Mass. 2025).  Petitioner's expert declaration, relying on statistics showing lengthy

11  periods of detention between 2021 and 2023 (even after the 2020 MOU), is unrebutted.  Chavez's

12  statement that "ICE has recently been unable to timely obtain travel documents and effectuate

13  removals to Vietnam" does not differentiate between Vietnamese immigrants who arrived ***before***

14  ***and after 1995***, and he does not provide any information about the *percentage* of cases in which ICE

15  has been able to do this.  *See Hoac*, 2025 WL 1993771, at *5; *Nguyen*, 788 F. Supp. 3d at 151–52.

16  Respondents' reliance on a ***single*** instance of an individual being repatriated to Vietnam in *Huynh* is

17  "hardly persuasive" to demonstrate changed circumstances.  *Hoac*, 2025 WL 1993771, at *5; *Liu v.*

18  *Carter*, No. 25-3036-JWL, 2025 WL 1696526, at *2 (D. Kan. June 17, 2025).  And though the

19  government has requested travel documents for Petitioner, the fact that it has not heard anything

20  after over a month and a half, Chavez Decl. ¶¶ 11, 13 when the 2020 MOU provides that it should

21  generally hear within 30 days, 2020 MOU § 8(3), (4), does not inspire great confidence that it will

22  be able to obtain them in the "reasonably foreseeable future."

23         Petitioner is thus likely to succeed on the merits of his claim that the government has not

24  established changed circumstances such that he will be removed to Vietnam in the reasonably

25  foreseeable future.  *See Hoac*, 2025 WL 1993771, at *5 (involving a Vietnamese national who

26  entered the U.S. as a child pre-1995, became a lawful permanent resident, but was ordered removed

27  in 2023 after being convicted of and serving sentence for murder); *Hoang v. Santa Cruz*, No. 5:25-

28  cv-02766-JGB-JCx (C.D. Cal. Oct. 28, 2025) [Dkt. 10] at 5 ("[T]he Court agrees with Petitioner"—

1   also a Vietnamese national, who entered the U.S. as a child pre-1995, became a lawful permanent

2   resident, was subsequently ordered removed, and had been released on an order of supervision since

3   2001—"that the government has not established that it is any more likely to acquire those travel

4   documents than it has since it issued Petitioner's removal order in 2000.").

5          In the alternative, even if there are changed circumstances rendering Petitioner's "reasonably

6   foreseeable" removal "significant[ly] likel[y]," the Court also finds that Petitioner has demonstrated

7   a likelihood of success on his claim that the government did not comply with the process laid out in

8   8 C.F.R. § 241.13(i)(2), (3).  First, Quan was never notified of the reasons for revocation of his

9   release.  He avers that he was given no prior notice that he would be detained and never informed or

10  presented with evidence of a violation of his conditions of release.  Quan Decl. ¶¶ 8, 10.  The

11  "Notice of Revocation of Release" that the government served him—*after* they re-detained him,

12  Chavez Decl. ¶ 9—states only that the decision was "made based on a review of your immigration

13  and criminal history" and "pursuant to 8 CFR 241.4."  Reply, Ex. [Dkt. 12-1] (Notice of Revocation

14  of Release).  Courts in this district, circuit, and across the country have held that such a vague,

15  generic statement is insufficient notice.  *See Bui v. Warden of Otay Mesa Detention Facility*, No. 25-

16  cv-2111-JES-DEB, 2025 WL 2988356, at *4 (S.D. Cal. Oct. 23, 2025) (finding the exact same

17  language to be insufficient notice); *Esmail v. Noem*, 2:25-cv-08325-WLH-RAO, 2025 WL 3030590,

18  at *5 (C.D. Cal. Sept. 12, 2025) (finding similar statement that petitioner's "file" "had been

19  reviewed" insufficient notice); *Yang v. Kaiser*, No. 2:25-cv-02205-DAD-AC (HC), 2025 WL

20  2791778, at *6 (E.D. Cal. Aug. 20, 2025) (similar); *M.S.L. v. Bostock*, No. 6:25-cv-01204-AA, 2025

21  WL 2430267, at *4, 10–11 (D. Or. Aug. 21, 2025) (similar); *Sarail A. v. Bondi*, No. 25-cv-2144-

22  ECT-JFD, 2025 WL 2533673, at *2, 10 (D. Minn. Sept. 3, 2025) (similar).

23         Second, there is no evidence that Quan has been afforded a meaningful informal or formal

24  interview.  Although Chavez declares that there was a "case review," an "interview of [Petitioner],"

25  and a "custody re-determination," he states that these happened before service of the Notice of

26  Revocation of Release.  Chavez Decl. ¶ 9.  That is not the "initial informal interview" contemplated

27  by section 241.14(i)(3), at which the noncitizen is supposed to have "an opportunity to *respond* to

28  the reasons for revocation *stated in the notification*."  8 C.F.R. § 241.13(i)(3) (emphasis added).

1    Quan declares that he was never given an opportunity to respond to any reasons for revocation.

2    Quan Decl. ¶ 11.

3         These failures by the government are in clear violation of the requirements of 8 C.F.R.

4    § 241.13(i)(3).  A growing number of courts—including this one—have unequivocally found that

5    the government's failure to follow its release revocation procedures renders the re-detention

6    unlawful and requires release.  *See Delkash*, 2025 WL 2683988, at *5–6 (collecting cases); *Hoac*,

7    2025 WL 1993771, at *4.  And to the extent another layer of analysis is required, the Court again

8    would follow its sister courts in finding that the failure to follow these procedural requirements

9    violates the due process clause.  *See Hoang*, No. 5:25-cv-02766-JGB-JCx (C.D. Cal. Oct. 28, 2025)

10   [Dkt. 10] at 3–6; *Bui*, 2025 WL 2988356, at *2–5 (S.D. Cal. Oct. 23, 2025).[3]

11         **B.    Irreparable Harm**

12         "It is well established that the deprivation of constitutional rights 'unquestionably constitutes

13   irreparable injury.'"  *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v.*

14   *Burns*, 427 U.S. 347, 373 (1976)).  "[U]nlawful detention certainly constitutes 'extreme or very

15   serious'" injury which "is not compensable in damages."  *Hernandez v. Sessions*, 872 F.3d 976, 999

16   (9th Cir. 2017).

17         Moreover, the Ninth Circuit has recognized the "irreparable harms imposed on anyone

18   subject to immigration detention," including "the economic burdens imposed on detainees and their

19   families as a result of detention, and the collateral harms to children of detainees whose parents are

20   detained."  *Id*. at 995.  Quan's family has articulated the support that he normally provides them and

21   the emotional distress that they are suffering in his absence.  *See* Nguyen Decl. ¶¶ 3–5 (discussing

22   emotional and financial hardship suffered by Quan's teenage son); Victor Decl. ¶¶ 2–4 (Quan's

23

24   _____

25   [3] Quan also argues that he is likely to succeed on the merits of his claims regarding third-country
     removals.  Motion at 17–26; Reply at 13; *see* First Amended Petition at 25–26, 28–30.  But the

26   government appears intent on effectuating his removal to Vietnam.  *See* Opposition at 10; Chavez
     Decl. ¶¶ 9, 11–14.  Thus, the Court cannot—and need not, in order to grant release—find that the

27   government has yet violated Quan's due process rights in this regard.  The Court cautions, however,
     that the government is required to follow its laws and regulations for removing noncitizens to third

28   countries, in addition to its rules regarding re-detention.  *See* 8 U.S.C. § 1231(b); 8 C.F.R. § 241.15.

1    younger brother); Vu Decl. ¶¶ 2–5 (Quan's mother); Wilkerson Decl. ¶¶ 2–5 (Quan's younger

2    sister).

3        Accordingly, this factor weighs in favor of granting the Motion.

4    **C.    Balance of Equities and Public Interest**

5        Finally, the balance of equities and public interest "tips sharply" in favor of Quan.  "[I]t is

6    always in the public interest to prevent the violation of a party's constitutional rights."  *Fellowship of*

7    *Christian Athletes*, 82 F.4th at 695 (citation omitted); *see also Valle del Sol Inc. v. Whiting*, 732 F.3d

8    1006, 1029 (9th Cir. 2013) ("[I]t is clear that it would not be equitable or in the public's interest to

9    allow the [government] . . . to violate the requirements of federal law." (citation omitted));

10    *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (the government "cannot suffer harm

11    from an injunction that merely ends an unlawful practice").

12        Of course, the government and the public have a significant interest in "enforcement of the

13    United States's immigration laws," Opposition at 11, but that includes an interest in "upholding

14    procedural protections against unlawful detention," *Pinchi v. Noem*, No. 5:25-cv-05632-PCP, 2025

15    WL 2084921, at *7 (N.D. Cal. July 24, 2025) (citation omitted).  Without these procedures, the

16    government cannot guarantee the accuracy of the outcome.  *See Ceesay v. Kurzdorfer*, 781 F. Supp.

17    3d 137, 144 (W.D.N.Y. 2025) ("[F]air process—not just the correct outcome—matters.  After all,

18    without due process, there is no way to tell whether the result is in fact correct.").

19

20

21

22

23

24

25

26

27

28

## V.    CONCLUSION

For the reasons stated herein, Quan's Motion is granted.  Respondent is hereby ordered to immediately release Petitioner from his custody.[4]

The parties are further ordered to file, within ten days of this order, a joint report regarding the status of compliance with this order.

Dated: November 14, 2025

_____
Hernán D. Vera
United States District Judge

---

[4] Rule 65(c) requires that, prior to granting injunctive relief, the Court require a movant to pay security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  "Despite the seemingly mandatory language, Rule 65(c) invests the district court with discretion as to the amount of security required, if any." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (citation omitted).  Accordingly, the Court waives the bond requirement here, as it is unlikely that the government will incur any significant cost and requiring a bond "would have a negative impact on plaintiff's constitutional rights, as well as the constitutional rights of other members of the public." *Baca v. Moreno Valley Unified Sch. Dist.*, 936 F. Supp. 719, 738 (C.D. Cal. 1996) (citation omitted).